NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1356-12T3

SALVATORE LOPRESTI and MARGARET
LOPRESTI,

    Plaintiffs-Appellants,

v.

WELLS FARGO BANK, N.A., successor
in interest to Wachovia Bank and
First Union,

    Defendant-Respondent.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **April 8, 2014** |
| **APPELLATE DIVISION** |

Argued March 10, 2014 – Decided April 8, 2014

Before Judges Parrillo, Kennedy[1] and
Guadagno.

On appeal from the Superior Court of New
Jersey, Law Division, Gloucester County,
Docket No. L-792-11.

Lewis G. Adler argued the cause for
appellant.

Jessica A. Goldfinger argued the cause for
respondent (Greenbaum, Rowe, Smith & Davis,
LLP, attorneys; John D. North, on the brief;
Ms. Goldfinger, on the brief).

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

_____

[1] Judge Kennedy did not participate in oral argument.  He joins
the opinion with counsels' consent for the purpose of
disposition.

The underlying action was instituted by plaintiffs Salvatore and Margaret Lopresti against defendant Wells Fargo Bank, N.A., successor to Wachovia Bank, N.A. and First Union National Bank (Wells Fargo), alleging the Bank wrongly collected a prepayment penalty on a commercial loan to their business, Body Max, Inc. (Body Max), which plaintiffs personally guaranteed and secured by a mortgage on their primary residence. On defendant's motion for summary judgment, the trial judge dismissed plaintiffs' complaint, finding that the proscription against such a charge in the New Jersey Prepayment Law, N.J.S.A. 46:10B-1 to -11.1, does not apply to commercial transactions like the one involved here. Plaintiffs appeal and argue, alternatively, that if the fee is allowed, it is excessive.

The facts are not in dispute. On March 1, 2002, Body Max executed and delivered a Promissory Note to defendant's predecessor, First Union, as evidence of a $550,000 loan. The terms of this note included an interest rate of 6.75% and required Body Max to make "consecutive monthly payments of principal and interest in the amount of $4,898.00 commencing on April 1, 2002 and continuing on the same day of each month thereafter until fully paid." The total principal and interest accrued on the loan was "due and payable on March 1, 2007." In addition, this original note contained a prepayment provision

setting a fee of 1% in the event Body Max paid the loan prior to the termination date:

> PREPAYMENT COMPENSATION. Principal may be prepaid in whole or in part at any time; provided, however, if principal is paid before it is due under this Note, whether voluntary, mandatory, upon acceleration or otherwise, such prepayment shall include a fee equal to 1% of the amount prepaid.
>
> Any prepayment in whole or in part shall include accrued interest and all other sums then due under any of the Loan Documents. No partial prepayment shall affect the obligation of Borrower to make any payment of principal or interest due under this Note on the due dates specified.

This note was executed by Salvatore Lopresti (Lopresti) in his capacity as President of Body Max.

In order to secure payment of its obligations under the original note, Body Max executed a Mortgage and Absolute Assignment of Leases dated March 1, 2002 to First Union. This mortgage covered Body Max's principal place of business, a gymnasium located on Delsea Drive in Washington Township. This document was also executed by Lopresti as President of Body Max.

Additionally, on March 1, 2002, Lopresti executed and delivered to First Union an Unconditional Guaranty to provide assurance that Body Max would fulfill its obligations under the original note. To secure payment and performance of the guaranty, plaintiffs executed and delivered a Mortgage and

A-1356-12T3

Absolute Assignment Agreement of Leases to First Union, covering the premises where their primary residence was located, also in Washington Township.

Pursuant to the loan transaction of March 1, 2002, First Union advanced the full $550,000 loan proceeds to Body Max. Body Max then transferred the funds to TD Bank in order to pay off a prior loan borrowed by Body Max. Plaintiffs did not personally receive any of the loan proceeds.

Thereafter, on December 20, 2005, Body Max modified the terms of its original note with Wachovia Bank, First Union's successor and Wells Fargo's immediate predecessor. Lopresti, as President of Body Max, executed and delivered the modified note of December 20, 2005 in the amount of $460,195.41. The modified note stated that it "renew[ed], extend[ed] and/or modifie[d] that [Original Note of Mach 1, 2002], evidencing an original principal amount of $550,000.00." The terms of the modified note included an interest rate of 7.25% and called for "consecutive monthly payments of principal and interest in the amount of $4,228.19 commencing on January 20, 2006, and continuing on the same day of each month thereafter until fully paid." All of the principal and interest on this modified note were "due and payable on December 20, 2020." Further, the modified note defined "loan documents" as "all documents

A-1356-12T3

executed in connection with or related to the loan evidenced by this Note and any prior notes which evidence all or any portion of the loan evidenced by this Note . . . guaranty agreements, . . . [and] mortgage instruments . . . ."

The December 20, 2005 modified note also contained a prepayment provision, structured to compensate Wachovia for an early payoff of the loan, in the event market interest rates had fallen. The provision states:

> COMPENSATION UPON PREPAYMENT OR ACCELERATION.
>
> In addition to principal, interest and any other amounts due under this Note, Borrower shall on demand pay to Bank any "Breakage Fee" due hereunder for any voluntary or mandatory prepayment or acceleration, in whole or in part, of principal of this Note occurring prior to the date such principal would, but for that prepayment or acceleration, have become due. For any date of prepayment or acceleration ("Break Date"), a Breakage Fee shall be due if the rate under "A" below exceeds the rate under "B" below and shall be determined as follows:
>
> Breakage Fee = the sum of the products of ((A-B) x C) for each installment of principal being prepaid, where:
>
> > A = A rate equal to the sum of (i) the bond equivalent yield (bid side) of the U.S. Treasury security with a maturity closest to the Maturity Date as reported by The Wall Street Journal (or other published source) on the funding date of this Note, plus (ii) 1/2%.

A-1356-12T3

B = A rate equal to the bond equivalent
yield (bid side) of the U.S. Treasury
security with a maturity closest to the
Maturity Date as reported by The Wall
Street Journal (or other published
source) on the Break Date.
C = The principal installment amount
being prepaid times (the number of days
remaining until the scheduled due date
for such installment divided by 360).

"Maturity Date" is the date on which the
final payment of principal of this Note
would, but for any prepayment or
acceleration, have become due.

Breakage Fees are payable as liquidated
damages, are a reasonable pre-estimate of
the losses, costs and expenses Bank would
incur in the event of any prepayment or
acceleration of this Note, are not a
penalty, will not require claim for, or
proof of, actual damages, and Bank's
determination thereof shall be conclusive
and binding in the absence of manifest
error.

Any prepayment in whole or in part shall
include accrued interest and all other sums
then due under any of the Loan Documents.
No partial prepayment shall affect
Borrower's obligation to make any payment of
principal or interest due under this Note on
the date specified in the Repayment Terms
paragraph of this Note until this Note has
been paid in full.

On May 19, 2010, Body Max attempted to refinance the

original 2002 loan, as modified by the 2005 loan, in order to

obtain a lower interest rate and to reduce the prepayment fees

on the loan.  However, about two months later, Wachovia declined

Body Max's request due to the company's "negative equity positions and losses."

Subsequently, Body Max was able to obtain refinancing from TD Bank Commercial Lending (TD Bank) and requested a payoff amount from Wachovia for the balance of the loan. On July 21, 2010, Wachovia provided Body Max with a payoff of all amounts due on the loan. TD Bank then transferred the total payoff amount of $416,838.78 directly to Wells Fargo, which included $368,383.99 of principal, $148.38 of accrued interest and $48,306.41 in prepayment fees. A Settlement Statement was executed by TD Bank and Body Max evidencing the total amount of the loan owed to Wells Fargo, including the prepayment fee, that was advanced by TD Bank on behalf of Body Max.

According to Wells Fargo, plaintiffs did not issue any personal checks from any of their personal accounts to pay the principal loan or the $48,306.41 prepayment fee due to the Bank. Rather, as noted, the prepayment fees were paid by TD Bank directly to Wells Fargo out of the proceeds of its loan to Body Max.

As noted, plaintiffs filed a complaint alleging that defendant violated both the Prepayment Law and the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -20, by assessing and collecting a prepayment charge as provided for in the promissory

note executed in connection with the business loan to Body Max. In its summary judgment motion, defendant maintained that plaintiffs lacked standing because they did not have a sufficient stake in the matter inasmuch as Body Max paid the prepayment fee through its refinancing arrangement with TD Bank. Substantively, defendant argued that the protection of the Prepayment Law allowing for prepayment without penalty to any "mortgagor," other than a corporation, simply does not apply to commercial loans between sophisticated business parties, such as the transaction at issue here. Additionally, defendant contended that the formula used to calculate the prepayment fee was reasonable and designed to protect the Bank's interests in the event that interest rates had fallen prior to the maturity of the loan. Finally, defendant maintained that there was no evidence of unlawful conduct to support the consumer fraud count.

Plaintiffs countered that they have standing as personal guarantors of the bank loan; that the Prepayment Law applies to this transaction because the initial loan was secured by their personal residence and they were personally liable for the obligations under the loan; that the prepayment fee was unreasonable because the modification of more than 13% was greater than the initial bargained for prepayment fee of 1% and

Wells Fargo failed to provide documentation evidencing how it reached the amount charged; and finally that the prepayment penalty amounted to a violation of the Consumer Fraud Act.

In granting summary judgment for defendant, dismissing plaintiffs' complaint in its entirety, the motion judge held that the Prepayment Law did not apply, reasoning:

> The corporation willingly negotiated the terms of [its] loan with the banks that were involved here. . . . There were sophisticated parties. Certainly the reason why a prepayment penalty cannot be imposed on the individual is to protect that individual, but it is not felt it was necessary when we have a corporation involved.

The court further explained "that there was a guaranty executed, which did involve the plaintiffs in this matter, but . . . the guaranty never came into play, the individuals never came into play in this matter, [because] there was no default."

The judge also found no Consumer Fraud Act violation:

> When we're dealing with the New Jersey Consumer Fraud Act, . . . a plaintiff must allege three elements under the Consumer Fraud Act. One, unlawful conduct by the defendant, and then we go on to an ascertainable loss and a causal relationship. . . .
>
> I find that the plaintiff in this matter is unable to provide the [c]ourt with any evidence whatsoever of unlawful conduct by the defendant in this matter and, therefore, that cause of action cannot be sustained either in this instance. They

A-1356-12T3

have failed on the first prong of the three-part test under the Act.

This appeal by plaintiffs followed.

As a threshold matter, we must determine whether plaintiffs had standing to bring this action against Wells Fargo. In order to have standing, "a party must have 'a sufficient stake and real adverseness with respect to the subject matter of the litigation.'" Triffin v. Somerset Valley Bank, 343 N.J. Super. 73, 81 (App. Div. 2001) (quoting In re Adoption of Baby T., 160 N.J. 332, 340 (1999)). Also, "'[a] substantial likelihood of some harm visited upon the plaintiff in the event of an unfavorable decision is needed for the purposes of standing.'" Ibid. (quoting In re Adoption of Baby T., supra, 160 N.J. at 340). "Standing has been broadly construed in New Jersey as 'our courts have considered the threshold for standing to be fairly low.'" Ibid. (quoting Reaves v. Egg Harbor Twp., 277 N.J. Super. 360, 366 (Ch. Div. 1994)). "A financial interest in the outcome ordinarily is sufficient to confer standing." Strulowitz v. Provident Life & Cas. Ins. Co., 357 N.J. Super. 454, 459 (App. Div.), certif. denied, 177 N.J. 220 (2003); Courier-Post Newspaper v. Cnty. of Camden, 413 N.J. Super. 372, 381 (App. Div. 2010).

In our view, although inchoate and contingent, plaintiffs have a real and genuine financial interest in the transaction at

hand by virtue of their unconditional personal guarantees of the original Wells Fargo loan and the later TD Bank refinance loan. Although sufficient, in our view, to confer standing upon them to bring this action, it does not qualify them for the protection against prepayment fees embodied in our Prepayment Law.

Pursuant to N.J.S.A. 46:10B-2, "[p]repayment of a mortgage loan may be made by or on behalf of a mortgagor at any time without penalty." Consequently, "[a]ny holder of a mortgage loan . . . who shall knowingly demand and receive prepayment fees . . . shall be liable to the mortgagor for the return of the whole amount of the prepayment fees so received, plus interest . . . ." N.J.S.A. 46:10B-5.

Thus, the Prepayment Law prohibits the charging of a prepayment fee on a "mortgage loan," which is defined as "a loan secured by an interest in real property consisting of land upon which is erected or to be erected, in whole or in part with the proceeds of such loan, a structure containing . . . dwelling units . . . ." N.J.S.A. 46:10B-1(a) (emphasis added). Moreover, a "mortgagor" is defined as "any person other than a corporation liable for the payment of a mortgage loan, and the owner of the real property which secures the payment of a mortgage loan[.]" N.J.S.A. 46:10B-1(b) (emphasis added).

The Prepayment Law applies to individual consumers, not commercial mortgagors, as the Legislature clearly "intended to protect individual mortgagors from being locked into long-term mortgages with excessive interest rates, but felt that more sophisticated commercial mortgagors needed no such protection." Shinn v. Encore Mortg. Servs., Inc., 96 F. Supp. 2d 419, 422 (D.N.J. 2000). Indeed, we have upheld the use of prepayment fees negotiated on commercial loans between sophisticated parties. See e.g., Westmark Commercial Mortg. Fund IV v. Teenform Assocs., L.P., 362 N.J. Super. 336, 347-48 (App. Div. 2003) (holding that the prepayment premium on a commercial loan was permissible where the debtor freely entered into the contract, the terms of the contract were clear and unambiguous, and the parties were experienced and sophisticated); Mony Life Ins. Co. v. Paramus Parkway Building, Ltd., 364 N.J. Super. 92, 105 (App. Div. 2003) (holding that a clear and unambiguous prepayment premium clause was "valid and enforceable under New Jersey law[]").

In Westmark, supra, the debtor challenged the prepayment premiums that were charged after the creditor accelerated the payout under the loan contract. 362 N.J. Super. at 343. We noted, at the outset, that "[a] borrower does not have the right, under New Jersey law, to prepay a commercial loan, unless

the documents afford that right."  Id. at 343-44 (citing Norwest Bank Minnesota v. Blair Road Assocs., 252 F. Supp. 2d 86, 97 (D.N.J. 2003)).  Thus, "'[s]ince a lender has the right not to have the loan prepaid but rely on collecting the interest contracted for, the lender is entitled to charge a penalty to the borrower for the privilege of the prepayment.'"  Id. at 344 (quoting Norwest, supra, 252 F. Supp. 2d at 97).  Further, we determined that prepayment clauses were "designed to protect a lender against potential losses it may incur if a loan is paid earlier than contracted for."  Ibid. (citing United States v. Harris, 246 F.3d 566, 573 (6th Cir. 2001)).

In holding that the prepayment fee in Westmark, supra, was enforceable, we relied, in part, on the Restatement (Third) of Property: Mortgages § 6.2 (1997).  Id. at 347.  Specifically, the Restatement notes that "if the borrower fully understood and had the opportunity to bargain over the clause, either with the assistance of counsel or by virtue of the borrower's own experience and expertise, the clause will ordinarily be enforced."  Restatement (Third), supra, § 6.2 comment c.  In addition, we reasoned that "to deem the [prepayment] clause unenforceable[] . . . would be providing defendants with a better contract than they were able to negotiate for themselves

. . . ." Id. at 347; see also Karl's Sales & Serv. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 493 (App. Div.) (finding that courts may not "remake a better contract for the parties than they themselves have seen fit to enter into, or to alter it for the benefit of one party and to the detriment of the other[]"), certif. denied, 127 N.J. 548 (1991).

Here, it is undisputed that the subject matter of plaintiffs' complaint involves a commercial loan to a business, and the loan proceeds were used for business, and not personal, much less residential home, purposes. Plaintiffs offer no proof to the contrary.

Nevertheless, plaintiffs argue that they fall within the Prepayment Law's definition of "mortgagor" because they are "any person other than a corporation" and they were liable for payment of the loan in the event Body Max defaulted. Specifically, they point to the guaranty executed as part of the initial promissory note, which provided their residential property as collateral security in the event Body Max defaulted on the loan. Plaintiffs' statutory interpretation is simply wrong.

On March 1, 2002, Body Max executed and delivered a Promissory Note to First Union as evidence of a $550,000 loan. Significantly, the borrower under the promissory note was not

14                                                    A-1356-12T3

plaintiffs but their business, Body Max. In fact, the 2002 and 2005 loan documents that contained the prepayment provisions explicitly designate Body Max as the borrower.

Just as significant, the full amount of the loan was advanced to Body Max under the original note. In other words, Wells Fargo transferred the loan proceeds directly to Body Max's corporate account, not to plaintiffs' personal accounts, and the proceeds were not used in connection with plaintiffs' real property. Also, to secure the amounts advanced under the original note, Body Max executed and delivered a mortgage on the commercial property where the corporation conducts business.

Even more fatal to plaintiffs' position, the mortgage referred to in their complaint, although it covers their residence, does not secure a personal loan, since, as noted, the loan proceeds were not used in connection with plaintiffs' real property. Rather, the mortgage secures plaintiffs' personal guarantee of the obligations of their business, Body Max, under the Wells Fargo commercial loan. As such, because the loan proceeds from the bank were not used in connection with plaintiffs' real property, their residential mortgage is not a "mortgage loan" within the definition of N.J.S.A. 46:10B-1(a), and therefore Wells Fargo is not the "holder of a mortgage loan"

subject to the protections against prepayment fees in the Prepayment Law.

In fact, neither plaintiffs' guarantee nor the mortgage on their residence provide for a prepayment fee, and plaintiffs did not pay the prepayment fee in this matter. Rather, the prepayment fee is expressly provided for in the note executed by Body Max and naming Body Max as the borrower. Pursuant to that contractual provision, it was Body Max that was charged the prepayment fee, and Body Max that paid all accounts owed to Wells Fargo, including the prepayment fee, when Body Max refinanced the loan with TD Bank.

To reiterate then, Body Max was the actual borrower and "mortgagor" under the Wells Fargo loan. The 2002 initial loan and the 2005 loan modification were both executed by Body Max and required the corporation to fulfill the loan obligations, including the prepayment fee. And to that end, Body Max fulfilled its obligations to Wells Fargo, including payment of the contractual prepayment fee, through its refinanced loan with TD Bank. And because of Body Max's corporate status, Wells Fargo, as holder of the mortgage loan, was exempted from the Prepayment Law's proscription against charging such a fee. N.J.S.A. 46:10B-1(b). Thus, we concur with the motion judge's

16                                                                        A-1356-12T3

holding that the Prepayment Law is inapplicable to the instant transaction.

We are therefore left with plaintiffs' alternative contention that the prepayment fee in the 2005 modified loan was excessive. Specifically, plaintiffs argue that the modified prepayment provision, which increased the 1% fee to over 13%, was unreasonable, and that the $48,306.41 prepayment charge amounted to an unlawful penalty or stipulated damage clause.[2]

Defendant maintains that the "breakage fee" formula used to calculate the prepayment charge was structured to do nothing more than compensate the Bank for the investment value lost in the event Body Max paid the loan off early at a time when interest rates had fallen. Specifically, Wells Fargo contends that if the interest rates at the time of refinancing were higher than the interest rates when Body Max received funding for the loan, there would have been no prepayment fee. Thus, Wells Fargo asserts that the formula was not an arbitrary penalty, but rather a mechanism to protect its investment. We agree.

In asserting that the prepayment charge was unreasonable, plaintiffs rely exclusively on MetLife Capital Financial

---

[2] It appears that the motion judge never addressed this issue; however, because the issue has been fully briefed on appeal, and the record allows for resolution, we have elected to address it.

Corporation v. Washington Avenue Associates L.P., 159 N.J. 484, 495-501 (1998), which addressed the reasonableness of a 5% late fee on a commercial loan. At the outset, the Court determined that "liquidated damages provisions in a commercial contract between sophisticated parties are presumptively reasonable and the party challenging the clause bears the burden of proving its unreasonableness." Id. at 496. The Court found that the reasonableness of a stipulated damages provision requires a review of the totality of the circumstances. Id. at 495. After considering several factors regarding this late fee, including (1) the normal industry standard; (2) the use of the fee to compensate the lender for administrative costs; (3) the fact that the "loan involved an arms-length, fully negotiated transaction between two sophisticated commercial parties, each represented by counsel[,]"; and (4) the absence of fraud, duress or unconscionability on the part of the lender, the Court concluded that the borrower was unable to overcome the presumptive reasonableness of the fee. Id. at 500.

Here, too, plaintiffs have not overcome the presumptive reasonableness of the prepayment fee. As the trial court noted, the loan transaction involved sophisticated parties, who freely negotiated the terms of the loan, and the prepayment provision was "clearly spelled out" in the 2005 loan modification. In

addition, as Wells Fargo asserts, the "breakage fee" was not an arbitrary penalty, but rather a carefully constructed formula used to protect the Bank's loan investment in the event interest rates dropped prior to the termination date.  The formula sought to protect Wells Fargo's investment by accounting for the market interest rates at the time of prepayment in comparison to the interest rates at the time the loan was first advanced.[3] According to this formula, if the interest rates at the time Body Max prematurely paid the loan were higher than when it first received the loan, then there would have been no prepayment fee.  Thus, the totality of the circumstances concerning the prepayment provision, including the sophistication of the parties involved, the use of the fee to compensate Wells Fargo, and considering that the formula used to calculate the breakage fee was "clearly spelled out," demonstrate that the charge was neither excessive nor unreasonable.

---

[3] For each monthly installment payment due on the loan, the breakage fee was calculated as the difference between the yield on Treasuries with the same maturity as the loan, as of the date the loan was originally funded, and the yield on Treasuries as of the date the loan was prepaid.  The result is a measure of the difference in the investment value of funds on the date of the loan and the date of the prepayment.  This figure was then multiplied by the amount of each principal installment being prepaid times the number of days remaining until the scheduled due date for such installment divided by 360.

A-1356-12T3

Finally, having found no violation by defendant of the Prepayment Law, and therefore no unlawful conduct or unconscionable commercial practice, plaintiffs simply have not established a viable, valid claim under the Consumer Fraud Act. Therefore, the dismissal of this count of plaintiffs' complaint was also proper.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1356-12T3