**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1099-22

SINATRA PROPERTIES,
LLC,

     Plaintiff-Respondent/
     Cross-Appellant,

v.

BERDAN COURT, LLC, FIRST
REAL ESTATE INVESTMENT
TRUST OF NEW JERSEY,
FREIT REGENCY, LLC,
STATION PLACE ON
MONMOUTH, LLC, and
WESTWOOD HILLS, LLC,

     Defendants/Third-Party
     Plaintiffs-Appellants/Cross-
     Respondents,

v.

KUSHNER REALTY
ACQUISITION, LLC,

     Third-Party Defendant-
     Respondent/Cross-Appellant.

_____

Argued January 29, 2024 – Decided May 1, 2024

Before Judges Gilson, DeAlmeida, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket No. C-000059-20.

Michael B. Himmel argued the cause for appellants/cross-respondents (Lowenstein Sandler LLP, attorneys; Michael B. Himmel, Matthew M. Oliver, Markiana J. Julceus, Nicholas D. Velez, and Kent Dawes Anderson, of counsel and on the briefs).

Kenneth A. Philbin argued the cause for respondents/cross-appellants (Greenberg Traurig, LLP, and Daniel J. Ansell (Greenberg Traurig, LLP) of the New York bar, admitted pro hac vice, attorneys; Kenneth A. Philbin, Daniel J. Ansell, Matthew Handler, and Paul H. Schafhauser, on the briefs).

PER CURIAM

This appeal involves disputes among sophisticated parties concerning a contract to sell six residential apartment complexes for $186 million. The sale did not occur. The prospective buyer, Sinatra Properties, LLC, an affiliate of Kushner Companies, LLC (collectively, plaintiff or Buyer), sued the sellers, which are a group of affiliated companies who own the properties (collectively, defendants or Sellers). Buyer sought to compel specific performance or, alternatively, damages, contending that Sellers had breached the purchase and sale agreement (the Purchase Agreement). Sellers asserted counterclaims,

2

claiming that Buyer had breached the Purchase Agreement by not closing, and they sought $15 million in liquidated damages plus attorneys' fees.

Sellers appeal from a portion of a summary judgment order holding that the liquidated damages provision in the Purchase Agreement was not enforceable. Buyer cross-appeals from the portions of the summary judgment order that (1) held that it breached the Purchase Agreement and (2) dismissed its claims. Buyer also appeals from orders denying its motion for reconsideration and awarding $3,420,422.88 in attorneys' fees to Sellers.

Having reviewed the record, including the Purchase Agreement, and the governing law, we (1) affirm the portion of the summary judgment order holding that Buyer breached the Purchase Agreement and dismissing Buyer's claims; (2) affirm the orders denying reconsideration and awarding attorneys' fees to Sellers; and (3) reverse the portion of the summary judgment order holding the liquidated damages provision unenforceable. We remand with direction that the trial court enter an order enforcing the liquidated damages provision and direct Buyer to pay Sellers $15 million in liquidated damages.

I.

Defendant First Real Estate Investment Trust of New Jersey (First Trust) is a publicly held real estate investment trust. The other defendants—Berdan Court, LLC; FREIT Regency, LLC; Station Place on Monmouth, LLC; and

A-1099-22

Westwood Hills, LLC—are affiliates of First Trust. Defendants own numerous real estate properties.

In 2019, defendants undertook efforts to market and sell seven residential apartment complexes they own. Through an advisor, they contacted over 100 potential buyers, including Sinatra Properties, LLC (Sinatra). Interested potential buyers were given access to an electronic data site with information about First Trust and its assets, as well as the right to tour the properties, which are located in New York and New Jersey. Defendants then conducted a competitive bidding process, receiving nineteen non-binding indications of interest, and ultimately selected a bid from Sinatra.

Sinatra is a special purpose limited liability company, formed by Kushner Companies, LLC (Kushner) for the purpose of buying the properties from defendants. Kushner describes itself as a "large, experienced, and sophisticated real estate company," which entered into $3 billion worth of transactions and extended $344 million in loans in 2019. Before entering into the Purchase Agreement, Sinatra conducted due diligence on the sale. Indeed, Sinatra's chief operating officer later testified that all due diligence at the properties had been completed before the execution of the Purchase Agreement.

On January 14, 2020, Sinatra and Sellers entered into the Purchase Agreement, under which Sinatra agreed to purchase from defendants seven

4

apartment complexes for $266,500,000. The Purchase Agreement was fifty-nine pages and was the result of extensive negotiations involving numerous lawyers and consultants who advised both Buyer and Sellers.

The Purchase Agreement provided, among other things: (1) "that time is of the essence with respect to this Agreement and any aspect thereof[;]" (2) the closing was to occur two business days after the closing conditions were satisfied; in that regard, the parties agreed that the closing would not happen before March 14, 2020, but would not be later than June 15, 2020; (3) a condition of closing was approval of the Purchase Agreement by First Trust's shareholders; (4) Sellers agreed to conduct and maintain the properties "in the ordinary course of [the] business consistent with past practice[;]" and (5) New Jersey law governed the Purchase Agreement.

The Purchase Agreement did not contain a financing contingency. Indeed, a representative of Sellers testified that Kushner had informed Sellers during negotiations that Kushner did not need financing. Nevertheless, the Purchase Agreement did contain a provision requiring Sellers to reasonably cooperate if Buyer sought financing by allowing any lender or investor access to the properties.

Under the Purchase Agreement, Buyer agreed to put $15 million in an escrow account as a deposit. The Purchase Agreement stated that if Buyer

5

defaulted, Sellers could terminate the agreement, and Buyer "shall forfeit the Deposit to Sellers and [the] Escrow Agent shall deliver the Deposit to Sellers as liquidated damages." In that regard, section 10.1 of the Purchase Agreement stated:

> If there is a Purchaser Default . . . Purchaser shall forfeit the Deposit to Sellers and [the] Escrow Agent shall deliver the Deposit to Sellers as liquidated damages (the parties agreeing that (x) Sellers' losses resulting from a termination due to a Purchaser Default would be difficult to quantify, and (y) such sum is not a penalty, but rather a reasonable measure of Sellers' damages resulting from a termination due to a Purchaser Default).

That provision also stated:

> SELLERS ACKNOWLEDGE AND AGREE THAT THIS SECTION 10.1 IS INTENDED TO AND DOES LIMIT THE REMEDIES AVAILABLE TO SELLERS AND SHALL BE SELLERS' EXCLUSIVE REMEDIES AGAINST PURCHASER HEREUNDER AND BOTH AT LAW AND IN EQUITY ARISING FROM OR RELATED TO A PURCHASER DEFAULT PRIOR TO THE CONSUMMATION OF THE CLOSING.

On February 28, 2020, the parties amended the Purchase Agreement. The largest apartment complex was removed from the sales transaction and the purchase price was reduced to $186 million for the remaining six properties. The amendment did not change the deposit amount or the liquidated damages provision.

6

On March 9, 2020, Sellers filed a proxy statement setting April 21, 2020, as the date for the First Trust shareholders' meeting to approve the Purchase Agreement. The following day, Sellers notified Buyer of the filing of the proxy statement, and Buyer responded: "Congrats on the filing and looking forward to a smooth closing." At approximately the same time, the parties exchanged a series of communications that the closing would take place in April 2020. On March 12, 2020, a Kushner employee informed Sinatra's broker that "our closing date will be April 23." On March 30, 2020, the same Kushner employee informed a potential financing source that "WE HAVE A SCHEDULED CLOSING DATE OF APRIL 23." On April 19, 2020, Sellers' counsel wrote to Buyer's counsel confirming the "closing date of 4/23." Before April 21, 2020, no one on behalf of Buyer informed Sellers that Buyer was not prepared to close in April 2020 in accordance with section 14.21 of the Purchase Agreement, which stated that all notices "must be in writing to be effective" and that "email may not be the sole means of delivery for any notice to be effective."[1]

---

[1] We note that there is reference in the record to a telephone conversation on March 31, 2020, between Kushner's chief executive officer and Sellers' broker discussing Buyer's desire to delay the closing and an email relaying this information to a member of the First Trust board, however, a copy of that email was not included in the record on appeal.

 A-1099-22

On April 3, 2020, Sellers' vice president of property management operations sent Buyer's chief operating officer an email describing how Sellers were responding to the COVID-19 pandemic. The email advised that Sellers were planning to enter into long-term payment plans with tenants struggling to pay rent, waive late fees, acquiesce to delinquent tenants' non-payment of rent, waive or reduce early termination fees for tenants seeking to break their leases, waive rent increases, and make other adjustments. Sellers also explained that they were ceasing to perform non-emergency repairs in tenants' apartments and would not allow Buyer or its representatives to go into individual apartments at the properties. The email asked for Buyer's approval of these changes, which Sellers explained they were compelled to implement by "government guidance and requirements (at the federal, state[,] and county levels)."

On April 5, 2020, Buyer's chief operating officer responded by email acknowledging that Kushner was "going through the same thing right now with our portfolio," and stated that "[o]n the surface the plan you have outlined below seems to be reasonable." The following day, Sellers' representative sent Buyer's chief operating officer an email stating that Sellers "will promptly implement at the sale properties the policies and procedures described in [the April 3] e-mail, as appropriate."

8

In late March 2020 and continuing into April 2020, the parties had communications concerning Buyer's financing for the transaction. Although Kushner had told Sellers that they did not need financing, Buyer nevertheless arranged financing for the transaction. In late March 2020, however, Buyer learned that some of its financing might be reduced, and new conditions might be imposed. Buyer, therefore, requested accommodations from Sellers, including a delay in the closing date. Sellers responded by requesting new conditions, including a $5 million increase in the deposit. Ultimately, Buyer did not agree to Sellers' new demands, and there was no written agreement changing the closing date.

On April 21, 2020, the First Trust shareholders met and approved the Purchase Agreement. Later that day, Sellers sent Buyer a notice of the shareholders' approval and set the closing for April 23, 2020.

The following day, Buyer informed Sellers that they did not want to move forward with the closing on April 23, 2020. Instead, they asked Sellers to establish the closing "at a mutually agreeable time." In that letter, Buyer asserted for the first time that Sellers were not in compliance with the Purchase Agreement due to certain changes in Sellers' business practices made in response to the COVID-19 pandemic. Sellers immediately replied and informed Buyer

A-1099-22

that time was of the essence and that they intended to close the following morning as scheduled.

Buyer did not appear at the closing on April 23, 2020. Over the next week, the parties exchanged communications to try to confirm a closing date. The parties, however, did not reach an agreement on a closing date. On April 30, 2020, Sellers notified Buyer that they were terminating the Purchase Agreement and served a notice of default on Buyer. Sellers also demanded the liquidated damages deposit from the escrow agent. Buyer objected, and the escrow agent informed the parties that the deposit would not be released until the parties' disputes were resolved.

On May 6, 2020, Buyer filed an action in the Chancery Division, contending that Sellers had wrongfully terminated the Purchase Agreement. Buyer asserted four causes of action seeking: (1) specific performance of the Purchase Agreement; (2) alternatively, a money judgment for damages, including attorneys' fees, arising from Sellers' breach of the Purchase Agreement; (3) a declaratory judgment that Sellers were required to perform under the Purchase Agreement; and (4) damages, including attorneys' fees, for Sellers' breach of the covenant of good faith and fair dealing. In the alternative, Buyer sought the return of the $15 million deposit. The following day, Buyer also filed notices of lis pendens on all the properties.

A-1099-22

Sellers responded with an answer and counterclaims, including a claim that Buyer had breached the Purchase Agreement and Sellers were entitled to $15 million in liquidated damages.

The parties then conducted and completed discovery. Thereafter, the parties cross-moved for summary judgment. After hearing oral argument, on February 4, 2022, the chancery court ruled on the summary judgment motions, explaining the reasons for its rulings on the record. The court held that (1) Buyer breached the Purchase Agreement by failing to close on April 23, 2020; and (2) the liquidated damages provision in the Purchase Agreement was unenforceable as a penalty. Accordingly, the chancery court dismissed all the other claims of the parties, directed that the $15 million deposit be returned to Buyer, and dismissed Buyer's lis pendens against the properties.

Shortly thereafter, Sellers moved for an award of attorneys' fees, and Buyer cross-moved for its attorneys' fees. While those motions were pending, in May 2022, Buyer moved for reconsideration of the February 4, 2022 summary judgment order. The court denied reconsideration in a July 8, 2022 order.

On December 8, 2022, the court issued its rulings on the fee applications. The court granted Sellers' motion for attorneys' fees, awarded Sellers $3,420,422.88 in fees, and denied Buyer's cross-motion for fees.

11

## II.

Sellers now appeal from the portion of the February 4, 2022 summary judgment order holding that the liquidated damages provision was an unenforceable penalty. Buyer cross-appeals from (1) the portion of that order holding that Buyer breached the Purchase Agreement and dismissing Buyer's claims and lis pendens; (2) the July 8, 2022 order denying reconsideration; and (3) the December 8, 2022 order awarding attorneys' fees to Sellers and denying Buyer's cross-motion for attorneys' fees.

Appellate courts review a grant or denial of summary judgment de novo, applying the same standard used by the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). Accordingly, we

12

"consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

Appellate courts review de novo a trial court's interpretation of a contract. Serico v. Rothberg, 234 N.J. 168, 178 (2018); JPC Merger Sub LLC v. Tricon Enters., Inc., 474 N.J. Super. 145, 159 (App. Div. 2022). We pay "no special deference to the trial court's interpretation and look at the contract with fresh eyes." JPC Merger Sub LLC, 474 N.J. Super. at 160 (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)).

In interpreting a contract, we look at the language used by the parties and construe that language consistent with its plain meaning, considering the overall purpose and meaning of the contract. See In re County of Atlantic, 230 N.J. 237, 254 (2017); JPC Merger Sub LLC, 474 N.J. Super. at 160-61. "Because '[t]he plain language of the contract is the cornerstone of the interpretive inquiry[,] "when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result."'" JPC Merger Sub LLC, 474 N.J. Super. at 161 (alterations in original) (quoting Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020)).

13

III.

We begin our analysis by addressing Buyer's cross-appeal of the portion of the summary judgment order holding that Buyer breached the Purchase Agreement. Buyer makes three arguments in support of its appeal of that ruling. First, it contends that it was not obligated to close because the closing conditions under the Purchase Agreement were not satisfied, and Sellers were in breach of the Purchase Agreement. Second, Buyer asserts that April 23, 2020 was never properly established as a time of the essence closing date in accordance with the Purchase Agreement. Finally, Buyer argues that, "under the totality of the circumstances," the chancery court erred by causing it to forfeit its right to acquire the properties. The plain language of the Purchase Agreement and the material undisputed facts concerning the communications between Buyer and Sellers do not support those arguments.

A.    The Closing Date.

"[I]f the contract itself provides a clear understanding that time is of the essence, then it is well-settled that 'prompt performance is essential,' and the date contained in the contract for closing will be strictly enforced by a court of equity." Marioni v. 94 Broadway, Inc., 374 N.J. Super. 588, 603 (App. Div. 2005) (citations omitted) (quoting Paradiso v. Mazejy, 3 N.J. 110, 115 (1949)); see also Gorrie v. Winters, 214 N.J. Super. 103, 107 (App. Div. 1986)

14

(explaining that "[t]he effectiveness of making time of the essence is dependent upon the expectation and understanding of the parties that their negotiated agreement requiring performance on a specified day and at a specified time will be strictly enforced without resort to litigation").

If a party commits "a 'breach of a material term of an agreement, the non-breaching party is relieved of its obligations under the agreement.'" Roach v. BM Motoring, LLC, 228 N.J. 163, 174 (2017) (quoting Nolan v. Lee Ho, 120 N.J. 465, 472 (1990)). "[A] breach is material if it 'goes to the essence of the contract.'" Ibid. (quoting Ross Sys. v. Linden Dari-Delite, Inc., 35 N.J. 329, 341 (1961)). After a material breach occurs, "the non-breaching party may treat the contract as terminated and refuse to render continued performance." Goldman S. Brunswick Partners v. Stern, 265 N.J. Super. 489, 494 (App. Div. 1993) (quoting Ross Sys., 35 N.J. at 341).

Section 5.1 of the Purchase Agreement stated that the closing would occur two business days after satisfaction or waiver of the closing conditions. Section 14.13 of the Purchase Agreement stated, "that time is of the essence with respect to this Agreement and any aspect thereof." Read together, and using the plain language of those provisions, those two sections establish that the parties agreed that the closing would take place two business days after the closing conditions

15

were satisfied and that the time of the essence provision applied to the closing date.

The communications between the parties confirmed that Buyer understood that the closing was scheduled for April 23, 2020. On March 10, 2020, Sellers notified Buyer that the shareholders' vote of approval on the Purchase Agreement had been scheduled for April 21, 2020. Two days later, a Kushner employee informed Buyer's broker that "our closing date will be April 23." On April 19, 2020, Sellers' counsel wrote to Buyer's counsel confirming the "closing date of 4/23." After the meeting on April 21, 2020, Sellers informed Buyer that the shareholders had approved the Purchase Agreement and that the closing would take place on April 23, 2020, at 9:00 a.m. Buyer responded, and contended for the first time that not all the closing conditions were satisfied. Therefore, it proposed establishing a closing on a "mutually agreeable" date.

B.    The Conditions to Closing.

Section 8.1 of the Purchase Agreement stated that Buyer's obligation to close was subject to the satisfaction of defined closing conditions. In that regard, section 8.1.2 stated: "Sellers shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed and complied with by them prior to or on the Closing Date."

16

Buyer argues that Sellers were not in compliance with three provisions of the Purchase Agreement: sections 7.1, 3.1.3, and 7.11. A review of the plain language of those sections and the parties' communications does not support those arguments.

Section 7.1 of the Purchase Agreement required Sellers to "conduct its business with respect to the applicable Property or Properties in the ordinary course of its business consistent with past practice." The plain meaning of that ordinary course provision was to ensure that the properties would be maintained and continue to operate without material change between the signing of the Purchase Agreement and the closing. See AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC, 268 A.3d 198, 214-15 (Del. 2021).

Buyer contends that Sellers made material changes to the operation of the properties in response to the COVID-19 pandemic. That argument, however, is rebutted by Buyer's communications to Sellers. On April 3, 2020, Sellers' vice president of property management operations emailed Kushner's chief operating officer requesting Buyer's approval of modifications Sellers were planning to implement to address the COVID-19 pandemic. Sellers expressly requested Buyer's approval of those practices. After receiving approval within the Kushner organization, the chief operating officer informed Sellers that the

A-1099-22

proposed practices were "reasonable." The chief operating officer later testified that Kushner itself was implementing similar practices.

Buyer now argues that Kushner never "approved" the practices. No objective reader of the communications would understand that Buyer was not approving the practices. Indeed, by not expressly disapproving of the practices, Buyer waived its objection to those conditions. See Knight v. Vivint Solar Dev., LLC, 465 N.J. Super. 416, 425-26 (App. Div. 2020) (explaining that waiving contractual rights requires "full knowledge of [those] rights" and "an intent to surrender those rights").

We also reject Buyer's arguments that Sellers implemented practices that were not covered by the communications between the parties. The material fact is that Buyer has not identified any practice or procedure implemented by Sellers that had an adverse material effect on the values of the properties. See Martin v. Rutgers Cas. Ins. Co., 346 N.J. Super. 320, 323 (App. Div. 2002) (explaining that self-serving assertions are "clearly insufficient to create a question of material fact").

Section 3.1.3 of the Purchase Agreement provided, in relevant part, that:

> Prior to the Closing, [Buyer] shall have the right, subject to the terms and conditions of the Access Agreement (including, without limitation, compliance with the insurance requirements thereunder), to conduct on-site, non-invasive physical and environmental

> examinations, inspections, tests, studies, evaluations, and investigations at the Properties (collectively, "**Physical Due Diligence**") in accordance with the terms of this Section 3.1.3 . . . .

Buyer argues that the COVID-19 pandemic prevented it from accessing the properties in March and April 2020, and, therefore, Sellers breached that section of the Purchase Agreement.

The Purchase Agreement and Buyer's own actions refute that argument. When Buyer signed the Purchase Agreement, it represented that it had already completed "all of its due diligence, investigations and inspections with respect to the Properties, to its satisfaction." It also represented that it was prepared to acquire the properties "subject to the risk" that it would not be able to "conduct physical and/or other investigations or inspections of the Properties." Following the close of discovery, Buyer has not produced any evidence that it sought to visit the properties in March or April 2020 and, therefore, Sellers never prevented Buyer from conducting inspections of the properties.

In addition, Buyer has not established a material breach of section 3.1.3 because its own actions confirm that the changes to the operation of the properties did not affect Buyer's willingness to close. Buyer did not want to close on the established closing date, but it did want to close on another date, as confirmed when it filed an action seeking specific performance.

19

Section 7.11 of the Purchase Agreement stated that Sellers agreed to "reasonably cooperate with [Buyer], at no cost or expense to Sellers, in [Buyer's] and its permitted designees' obtaining financing for the Properties." In late March and early April 2020, Buyer advised Sellers that one of its financers, Freddie Mac, had imposed new requirements to secure loan payments. Buyer, therefore, requested Sellers to delay the closing.

Buyer argues that Sellers' refusal to delay the closing if Buyer did not comply with Sellers' new demands constituted a breach of section 7.11 of the Purchase Agreement. A plain reading of the Purchase Agreement does not support that argument. The Purchase Agreement did not have a financing contingency. Section 7.11 required only that Sellers "reasonably cooperate" with Buyer's attempt to secure financing. That section expressly stated that Sellers "shall not be obligated to make any payments or accommodations in connection therewith."

C.     The Alleged Forfeiture.

Finally, Buyer, for the first time on reconsideration, argued that the chancery court should not have found that Buyer breached the Purchase Agreement because that finding resulted in a forfeiture of Buyer's right to purchase the properties. We reject this argument because Buyer, a sophisticated company represented by experienced and knowledgeable lawyers and

20

consultants, is effectively asking us to rewrite the Purchase Agreement. A plain reading of the Purchase Agreement establishes that Sellers negotiated for a closing date that would be enforced pursuant to a time of the essence clause. Buyer clearly knew the risk it had undertaken, and there is no equitable ground for rewriting the Purchase Agreement. See Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp., 100 N.J. 166, 182 (1985) (explaining that when "parties choose to contract for a forfeiture, a court of equity will not interfere with that contract term in the absence of fraud, accident, surprise, or improper practice").

D.    Buyer's Breach.

In summary, the plain language of the Purchase Agreement and the material undisputed facts establish that a time of the essence closing date was set for April 23, 2020. It is undisputed that Buyer did not close on that date. Therefore, Buyer breached a material provision of the Purchase Agreement, and the chancery court did not err in entering summary judgment on that breach. Given that breach, all of Buyer's other claims were properly dismissed because those claims required Buyer to establish that it was in compliance with the Purchase Agreement. See Stern, 265 N.J. Super. at 494 (explaining that "the non-breaching party may treat the contract as terminated and refuse to render continued performance").

21

IV.

In their appeal, Sellers contend that the chancery court erred in holding that the liquidated damages provision was unenforceable. We agree and, therefore, reverse that portion of the summary judgment order.

Whether a liquidated damages clause is enforceable is a question of law, which we review de novo. Wasserman's Inc. v. Twp. of Middletown, 137 N.J. 238, 257 (1994). Accordingly, we do not defer to the chancery court's interpretation of that legal issue. Serico, 234 N.J. at 178; Holtham v. Lucas, 460 N.J. Super. 308, 316-17 (App. Div. 2019).

"In a commercial contract between sophisticated parties, liquidated damages clauses are presumptively reasonable, and the party challenging the clause bears the burden of proving its unreasonableness." Sullivan v. Max Spann Real Est. & Auction Co., 465 N.J. Super. 243, 263 (App. Div. 2020), aff'd as modified, 251 N.J. 45 (2022). Courts look at four factors in evaluating whether a liquidated damages provision is reasonable: (1) "the difficulty in assessing damages," (2) "intention of the parties," (3) "the actual damages sustained," and (4) "the bargaining power of the parties." MetLife Cap. Fin. Corp. v. Wash. Ave. Assocs. L.P., 159 N.J. 484, 495 (1999). "[T]he 'overall single test of validity' is whether the liquidated damages clause is 'reasonable under the totality of the circumstances.'" Sullivan, 465 N.J. Super. at 262-63

22

(quoting MetLife, 159 N.J. at 495). "[T]he reasonableness test is applied either at the time the contract is made or when it is breached." MetLife, 159 N.J. at 502.

Moreover, in evaluating liquidated damages clauses, we have adopted the methodology described in the Restatement (Second) of Conts. § 356 (Am. L. Inst. 1981). Sullivan, 465 N.J. Super. at 262. Section 356 of the Restatement provides:

> Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.
>
> [Restatement (Second) of Conts. § 356.]

In the Purchase Agreement, Buyer expressly agreed that if it defaulted, Sellers would get the $15 million deposit "as liquidated damages." Buyer also agreed that "Sellers' losses resulting from a termination due to a Purchaser Default would be difficult to quantify, and . . . such sum is not a penalty, but rather a reasonable measure of Sellers' damages resulting from a termination due to a Purchaser Default."

Buyer has not demonstrated that Sellers' damages were easy to determine at the time of contracting or the time of breach. To the contrary, Buyer expressly

23

agreed at the time of contracting that Sellers' damages would be difficult to determine. Moreover, Buyer has presented no facts showing that Sellers' damages were not difficult to determine at the time of the breach, which was just over three months after the Purchase Agreement was signed. The record establishes that Buyer and Sellers were sophisticated parties, and that they carefully negotiated the Purchase Agreement with the advice of lawyers and consultants. Our Supreme Court has stated that courts should hesitate to second-guess liquidated damages provisions when the parties are sophisticated, commercial entities represented by able counsel. In that regard, the Court has explained:

> In commercial transactions between parties with comparable bargaining power, stipulated damage provisions can provide a useful and efficient remedy. Sophisticated parties acting under the advice of counsel often negotiate stipulated damages clauses to avoid the cost and uncertainty of litigation. Such parties can be better situated than courts to provide a fair and efficient remedy.
>
> [Wasserman's, 137 N.J. at 253 (citations omitted).]

The Purchase Agreement also confirms that Buyer and Sellers intended to be bound by the liquidated damages provision. The liquidated damages provision was mutually beneficial. It provided Sellers with defined liquidated

damages of $15 million. It also limited Buyer's exposure to $15 million if it breached the Purchase Agreement.

Both at the time of contracting and at the time of the breach, Sellers' damages were uncertain. The record establishes that Sellers went through a very sophisticated bidding process prior to entering into the Purchase Agreement. The process involved lawyers and consultants, and various fees were incurred. There was also the inherent uncertainty of changes in market conditions related to the values of the six apartment complexes. Indeed, when the parties amended the Purchase Agreement in February 2020, they did not change the language of the liquidated damages provision or the $15 million liquidated damages.

Finally, it is indisputable that Buyer and Sellers enjoyed equal bargaining power. See, e.g., Lopresti v. Wells Fargo Bank, N.A., 435 N.J. Super. 311, 324 (App. Div. 2014) (upholding liquidated damages provision in a loan transaction involving "sophisticated parties, who freely negotiated the terms of the loan, and the prepayment provision was 'clearly spelled out' in the 2005 loan modification"); Mony Life Ins. Co. v. Paramus Parkway Bldg., Ltd., 364 N.J. Super. 92, 106 (App. Div. 2003) (explaining that "[i]t is settled that a stipulated damages clause . . . negotiated between sophisticated commercial entities[] is presumptively reasonable").

A-1099-22

In summary, a review of the four <u>MetLife</u> factors establishes that the liquidated damages provision in the Purchase Agreement was legal and enforceable. We, therefore, vacate the portion of the summary judgment order that declared the provision unenforceable as a penalty. We remand with the direction that the trial court enter an order enforcing the liquidated damages provision by directing Buyer or the escrow agent to pay the $15 million deposit to Sellers.

V.

Finally, we address Buyer's appeal from the order awarding Sellers attorneys' fees. A party can recover attorneys' fees if the award of those fees is expressly provided for in a contract. <u>See</u> <u>Litton Indus., Inc. v. IMO Indus., Inc.</u>, 200 N.J. 372, 385 (2009) (quoting <u>Packard-Bamberger & Co. v. Collier</u>, 167 N.J. 427, 440 (2001)).

Section 14.24 of the Purchase Agreement stated: "In connection with any litigation initiated by a party hereto against the other party hereto arising out of this Agreement, the party adjudicated to be the substantially prevailing party shall be entitled to recover reasonable attorneys' fees and disbursements from the other party." Thus, the trial court was required to engage in a two-step process. First, it needed to determine which party prevailed, and then it needed to assess whether the amount of fees was reasonable. <u>See</u> <u>id.</u> at 386; <u>see also</u> <u>N.</u>

26

Bergen Rex Transp., Inc. v. Trailer Leasing Co., 158 N.J. 561, 570 (1999). Generally, the party who prevails on a breach of contract claim satisfies the contractual right for an award of fees. Litton Indus., 200 N.J. at 385-86. "[F]ee determinations by trial courts will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion." Empower Our Neighborhoods v. Guadagno, 453 N.J. Super. 565, 579 (App. Div. 2018) (alteration in original) (quoting Packard-Bamberger, 167 N.J. at 444).

Sellers prevailed on their breach of contract counterclaim. In addition, we have now held that Sellers are entitled to liquidated damages and, therefore, they have also prevailed on that claim. Accordingly, Sellers were the prevailing party in this litigation, and under the Purchase Agreement, they were entitled to reasonable attorneys' fees.

In assessing a request for attorneys' fees, a court must determine the "lodestar," which is the "number of hours reasonably expended by the successful party's counsel in the litigation, multiplied by a reasonable hourly rate." Litton Indus., 200 N.J. at 386; see also Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 21 (2004); Rendine v. Pantzer, 141 N.J. 292, 334-35 (1995). A court must determine whether the hourly rates are reasonable, which involves "assess[ing] the experience and skill of the prevailing party's attorneys and compar[ing] their rates to the rates prevailing in the community for similar services by lawyers of

A-1099-22

reasonably comparable skill, experience, and reputation." Rendine, 141 N.J. at 337 (quoting Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990)). "[T]he trial court should satisfy itself that the assigned hourly rates are fair, realistic, and accurate, or should make appropriate adjustments." Id. at 337. In making that inquiry, the court should consider the factors laid out in RPC 1.5(a):

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
>
> (8) whether the fee is fixed or contingent.

In calculating the number of hours to be used in determining the lodestar, a court "must not include excessive and unnecessary hours spent on the case." Furst, 182 N.J. at 22. A court has discretion to exclude certain hours from the

28

calculation "if the specific circumstances incidental to a counsel-fee application demonstrate that the hours expended, taking into account the damages prospectively recoverable, the interests to be vindicated, and the underlying statutory objectives, exceed those that competent counsel reasonably would have expended to achieve a comparable result." Rendine, 141 N.J. at 336.

Here, the trial court did not abuse its discretion in awarding Sellers attorneys' fees of $3,420,422.88. Before the trial court, Buyer did not contest the reasonableness of the hourly rates, the amount of time Sellers' counsel spent, or the quality of Sellers' counsel's work product. The trial court carefully reviewed Sellers' counsel's certification, including assessing the work performed by Sellers' counsel. The court then found that the amounts charged were appropriate and reasonable. The court, thereafter, conducted a thorough review of the invoices. In short, the trial court engaged in the appropriate analysis, and we discern no abuse of discretion.

Buyer argues that in the summary judgment order, the court dismissed Sellers' claims for attorneys' fees. That argument is not accurate. While the court did not address attorneys' fees in its summary judgment order, Rule 4:49-2 allows an application for attorneys' fees to be made within twenty days. See Shimm v. Toys From The Attic, Inc., 375 N.J. Super. 300, 303 (App. Div. 2005). Indeed, both Sellers and Buyer filed motions for attorneys' fees. Consequently,

Sellers' right to recover attorneys' fees was not precluded by the summary judgment order and was properly considered.

## VI.

In summary, we affirm the portions of the February 4, 2022 summary judgment order that (1) held that Buyer breached the Purchase Agreement, and (2) dismissed all Buyer's other claims and the lis pendens on the properties. We reverse the portion of the February 4, 2022 order that held the liquidated damages provision unenforceable. We remand with direction that the trial court enter an order enforcing the liquidated damages provision and directing Buyer or the escrow agent to pay Sellers $15 million in liquidated damages. We also affirm the July 8, 2022 order denying Buyer's motion for reconsideration. Finally, we affirm the December 8, 2022 order granting Sellers' motion for attorneys' fees and costs.

Affirmed in part, reversed in part, and remanded in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1099-22